## HENRY ATKINS & CO. v. THE TOWN OF RANDOLPH.

*Town agents for the sale of intoxicating liquor. Contract. Constitutional law. Municipal corporations.*

The third section of the act of 1852, entitled "an act to prevent traffic in intoxicating liquors for the purpose of drinking" (see laws of 1852, p. 20), is unconstitutional, so far as it authorizes the agent, appointed by the county commissioner, to purchase liquors at the expense of the town, for which he is appointed, without its assent, either express or implied, or without giving indemnity to the town for the faithful execution of the duties of his agency.

M. was appointed agent for the sale of liquors in the town of Randolph, by the commissioner for Orange County, for 1853, and in pursuance of that appointment purchased liquors of the plaintiffs in that year, and the next, at the credit of that town. He gave no bond to the town for the faithful execution of the duties of such agency, nor did the town receive any of the money realized from the sale of such liquors, or any benefit therefrom; nor

Atkins & Co. *v*. The Town of Randolph.

did the selectmen prescribe any compensation for his services, nor had the town any knowledge that he was purchasing liquors on its credit. *Held*, that the town were not liable for such purchases.

So far as a municipal corporation is endowed with the power of contracting, and of acquiring and disposing of property, it stands on the same ground, of exemption from legislative control and interference, as a private corporation.

ASSUMPSIT for goods sold and delivered. Plea, the general issue, and trial by the Orange County Court,—POLAND, J., presiding.

The plaintiffs' claim was for liquors sold by them in Boston, in the years 1853 and 1854, all of the account having accrued in 1853, except one item of seventy dollars and seventy-one cents, for three barrels of Medford rum, which were sold Jan. 18, 1854.

The plaintiffs gave evidence tending to prove that they sold the liquor, charged in their account, at the respective dates therein stated, to the town of Randolph, and upon its credit, upon the order of Samuel B. Mann, the agent for selling liquor in that town appointed in 1853; that John E. Chamberlin was in 1853 duly elected commissioner for Orange County, under the act of 1852, entitled " an act to prevent traffic in intoxicating liquors for the purpose of drinking;" and that Samuel B. Mann was duly appointed by him agent for the town of Randolph, for the sale of liquors under that act, previous to the date of the first item of the plaintiffs' account.

The defendants introduced evidence tending to prove that Mann never gave any bond to the town of Randolph under his appointment as such agent, and never paid any of the money received for the sale of liquors into the town treasury ; that the selectmen of that town never prescribed any compensation for his services as such agent, and that the town received no benefit whatever from the sales of liquor made by him, and had no knowledge that he was purchasing liquors on the credit of the town.

It appeared that the plaintiffs, at the time of selling the liquors in question, knew of the existence of the act of 1852, above referred to, and understood that Mann was agent for the town of Randolph under that act, and that the liquors were purchased by him under and in pursuance of such agency. It also appeared that at the time of Mann's appointment as agent by Chamberlin,

he was bankrupt and entirely irresponsible; that this was known to the plaintiffs, and that he was largely indebted to them upon previous purchases made on his own account; but there was no evidence that this was known to Chamberlin, nor was there any evidence in regard to his being a suitable or unsuitable person for such agency.

Upon these facts the court rendered judgment for the plaintiffs for the amount of their account, to which the defendants excepted.

*L. B. Peck* and *William Hebard*, for the defendants.

I. The act of 1852, sec. 3 (laws of 1852, p. 20), under which it is attempted to hold the defendants, does not authorize the *agent* (a misnomer), to bind the town without its assent. This may be fairly implied. The commissioner is not required to appoint an agent in every town. He *may* appoint. The compensation of the agent is to be *prescribed* by the selectmen, etc., thus clearly indicating that the town were to participate in the business, *to assent*. If the act is thus construed, it removes its most objectionable features. It should be thus construed upon every principle.

II. 1. If the act is not thus construed, we insist that the third section, authorizing the appointment of agents of towns by the commissioner, is entirely beyond the constitutional power of the legislature. The law can confer power to do *official acts* of a public character, but not to execute those functions which pertain to individuals in their private capacity.

2. Agents are not officers, and they do not sustain the relation of *officials* to the public, neither in the manner of their appointment, nor in their duties.

The term *agent* implies a principal, and the relation of *principal* and *agent* exists where one person authorizes another to do acts or make engagements in his name; Paley's Agency, 1.

The plaintiffs have sued the defendants upon a contract which must have been made either by the defendants or by his agent.

The contract was not made by the defendants, nor by any one authorized by him.

3. When a man has a right to do an act in his own name, he may appoint another to do it for him; Paley's Agency, 1.

Had the town of Randolph the right to purchase and make sale of *intoxicating liquors* by virtue of any law? Had the town of Randolph the right to appoint an agent to sell for them?

If the town had no authority to sell, nor right to appoint an agent to sell for them, a very suggestive inquiry is started in relation to any authority that can be conferred upon another to act as agent for the town.

4. The transactions of the *agent*, to bind the *principal*, must be restrained to transactions and concerns appurtenant to the business of the principal. And he has no power to bind the principal for goods which were not bought for him and did not come to his use; *Odiorne* v. *Maxcy*, 13 Mass. 181.

5. Agents may be appointed by government pursuant to the provisions of law, but in that case they are the agents of government, and not the agents of others.

6. Towns are corporations, and corporations are to be regarded like persons, as coming under the provisions of all general laws.

Would it be claimed that a law was constitutional which required an individual to enter into a branch of business without his consent?

Would it be claimed that such law was constitutional, if it required him to entrust the business to an *agent*, in whose appointment he had no *voice*, over whose acts he had no control, and over whom he possessed no power of removal, or of calling him to an account, and for whose *fidelity* he had no *security?*

We believe no one would have the hardihood to advocate so flagrant an absurdity.

And still these propositions contain no greater *absurdity* than the law under which the plaintiffs seek to recover in this case.

The law provides for the election of a commissioner. The commissioner appoints an *agent* for the town. The town is not consulted in relation to the business, nor in relation to the agent who is to transact it. The town is not notified that an *agent* is to be appointed, nor who the agent is to be. The agent, when thus appointed, is clothed with power to contract debts to *any amount* on the credit of the town, and without notifying or consulting the town.

III. The unconstitutionality of the third section of this statute,

has been virtually pronounced by the legislature of 1853, which repealed that section, and obviated the obnoxious parts of its provisions.

*E. Weston* and *P. Perrin,* for the plaintiffs.

The act of 1852, "to prevent traffic in intoxicating liquors for the purpose of drinking," has been held to be a *police regulation,* and fully within the constitutional power of the legislature, so far as regards the prohibition of the sale of liquor for certain purposes, and in other respects, in the following cases : In *re Powers,* 25 Vt. 61 ; *State* v. *Parker,* 26 Vt. 327 ; *State* v. *Prescott,* 27 Vt. 194 ; *State* v. *Conlin,* 27 Vt. 318 ; *in re Dougherty,* 27 Vt. 325 ; *Lincoln* v. *Smith,* 27 Vt. 328.    See also *Thorpe* v. *Rutland & Burlington R. R. Co.,* 27 Vt. 140, where the power of the legislature to make such police regulations as they think proper, is fully sustained.    See also Redfield on Railways, p. 548.

While the statute of 1852 prohibits the traffic in intoxicating liquors for the purpose of drinking, it at the same time sanctions it for "medicinal, chemical and mechanical purposes," and in order to sustain and regulate the traffic for those purposes, the sections providing for the election and powers of county commissioners, and the appointment and duty of town agents were enacted.    These sections are as much within the constitutional power of the legislature, and are as fully *police regulations,* as those other portions of the act which have been sustained by the supreme court.

Mann is liable to pay the avails of his sales to the town, and would no doubt have done so from time to time, if the selectmen had requested it, and prescribed a compensation for his services.

BARRETT, J.    In this case, the plaintiffs sold liquors to Samuel B. Mann, as the " *agent*" for the town of Randolph, appointed by the county commissioner under the provisions of the third section of the act of 1852, "to prevent traffic in intoxicating liquors for the purpose of drinking."

The plaintiffs' account shows that the liquors were sold by them at different times within the year 1853, except three barrels of Medford rum, sold under date of January 18, 1854.    In the view

we take of the case, however, the fact that this last item of charge accrued after the amendment of the act, in respect to the purchase of liquors by such agents, went into operation, is of no importance.

Mann gave no bond under the provision of the law in that behalf; nor did he pay any of the money realized on the sale of the liquors into the treasury of the town ; nor did the selectmen of the town prescribe any compensation for the agent; nor did the town receive any benefit from the sale of the liquors; nor had the town any knowledge that the agent was purchasing liquors on its credit.

For the purpose of discussing and deciding the main question that is made in this case, the above is a sufficient statement of the facts ; for, if in virtue of the *agency* created by the act of 1852, Mann was authorized to purchase the liquors and bind the town to pay for them, the plaintiffs are entitled to recover.

Had Mann valid authority by virtue of that statute so to do ?

The decision of this question can not rest, on either side, upon the common doctrines applicable to the relation of principal and agent, for that relation did not exist. No idea can be formed of such a relation only as arising from the authorization, express or implied, given by the principal to the agent. This case negates such an authorization. Mann was designated for, and appointed to the office, without any participation or control on the part of the town. The town had no control over his acts, and it has not, in any way, assented to or ratified them. Every feature of *agency*, then, in its common law sense and acceptation is excluded. The term " *agent* " is used in the statute, it is true, but it is an appropriation of the *term*, without regard to the substance, and an arbitrary application of it to an officer, created by virtue of the statute, whose relations, functions and duties, as prescribed by the statute, differ in all material respects from those of an agent of the town, in any proper sense of an agency.

The decision of the case, then, stands upon the question, whether the provisions of the statute, clothing the agent with his official powers, are valid.

As the case is before us, it presents this simple proposition in behalf of the plaintiffs, viz : that the legislature have the consti-

tutional authority to clothe Samuel B. Mann with power to contract, without the authorization, consent or knowledge of the town, for, and in the name, and on the credit of the town, and thereby bind it by contracts thus made in the behalf provided in the third section of the statute in question. No question being made about the regularity of Mann's appointment as such agent, nor about his having made the purchases under color of the office which he thus held, the rights of the plaintiffs in this case rest upon that proposition; which proposition is denied by the defendants. Hence the duty is cast upon the judicial department of the government of determining the matter in issue. The legislature have performed their functions in enacting the law. The court, as a co-ordinate branch of the government, must perform their function by passing upon the questioned validity of this provision of the law.

It may be well, in view of one ground assumed and argued by the counsel for the defendant, to determine whether the provision under consideration, requires or warrants any implication or intendment beyond the natural import of its terms. It is claimed for the defendants, that the court should construe the section as meaning the same as if the words " and with the consent," had been inserted after the words " at the expense," and so stand that the agent might " purchase at the expense *and with the consent* of the town or city," etc. ; and that, inasmuch as no assent of the town is shown, the plaintiffs are not entitled to recover.

We recognize the settled doctrine of construction applicable to statutes in this respect, and do not question the propriety of its application in the cases that were cited in the argument. But that doctrine is only applicable when such an addition, by implication, is necessary, in order to effectuate the supposed intention of the legislature. In the case before us, we are satisfied that the legislature have fully expressed just what, and all, they intended in this respect. The design was to create and put in operation the liquor agency, irrespective of the assent of the town. It was to make the operation of the law upon this subject, independent of the views of the majority in any town that might be adverse to the law, or to this particular provision of the law, and to render it uniform throughout the county: depending in

Atkins & Co. *v.* The Town of Randolph.

some measure, for the character of such operation, upon the character and official conduct of the commissioner whom the county should elect.

Such being our views of the intent of the legislature, and regarding the language of this provision as full and explicit in expressing that intent, it would be disingenuous, and savor of timorous delicacy, to avoid the direct question of the validity of the law, by assigning to the language used a meaning that the legislature did not intend.

This provision of the law is claimed to be valid, as being within the scope of legitimate legislation under the constitution. It is asserted that the law is for the regulation of the *internal police* of the State, and that under that clause of the bill of rights which says, " that the people of this State, by their legal representatives; have the sole, inherent and exclusive right of governing and regulating the internal police of the same," the legislature had full warrant for enacting the law, just as it originally stood, in all its provisions. It is worthy of inquiry, however, whether that article of the bill of rights was designed primarily, or in any sense, to *confer* authority, or only to deny the existence of authority in any *other power* to govern and regulate the internal police of the State.

The entire theory of government in this country assumes that the people of a State have the right to govern and regulate in this respect. That article seems to be predicated upon that assumption, and inserted by way of express denial of that right to any body but the people of the State. It was incorporated into the first constitution of this State, framed by the convention holden at Windsor, on the 2d of July, 1777. The colonial history of this country, and the relation then existing between this country and the government of Great Britian, explain and show the purpose why the article was thus incorporated. We regard it as having been designed, not to *confer* authority upon the legislature, but to deny the existence of the right in any body but the people of the State. That right is to be exercised by them through the legislature, whose powers and duties are elsewhere in the constitution amply provided for and defined.

It is fully conceded that the statute of 1852 is a matter of

*police regulation*, and so, as a subject, was within the province of legislative functions. But it by no means follows, that the legislature, in acting upon *the subject*, may not have transcended their constitutional authority. So far as prohibiting the traffic in intoxicating liquors, and prescribing penalties and modes of prosecution is concerned, it has been several times properly decided that the law, as a police regulation, is constitutional and valid. But this case arises upon another feature of the law. Section 3 provides a mode by which liquors may be kept, furnished and sold for certain lawful purposes, with the obvious design of thereby removing both the temptation, and any supposed necessity of vioating the prohibitory part of the law. The legislature have undoubted authority to make provision in this respect, but that authority must be exercised in a manner consistent with the constitution.

We do not feel called upon in this case, to discuss or decide the somewhat vexed question, whether an act of the legislature is to be held void, irrespective of constitutional restriction, on the ground of its being contrary to natural right, justice and equity. Much might be, as much has been said, with pertinency and force, on both sides of the question. For present purposes, it is sufficient to rest our decision on the ground that constitutional restriction is the sole restraint upon legislative omnipotence.

Since some early judicial notions of Chief Justice GIBSON, no judge or court has intimated that the property of one person could be taken without his consent and transferred to another, either with or without compensation, merely by force of legislative enactment. In whatever form the question may arise, the uniform judgment of the courts of this country has settled that such would be unconstitutional and void legislation. This, then, would seem to be conclusive against the right, by virtue of the act of the legislature, through the machinery of the official agency of Samuel B. Mann, to take the property of the town of Randolph, or of the inhabitants of that town, and put it into his pockets without their consent. Practically, that is sought to be done by this suit. For he has received and used without account, the avails of the liquors for which it is now sought to charge the town. It is no answer to this to say, that Mann is liable to be sued by the town

for the money thus received and used by him.   For he is made
their factor and trustee without their privity or consent, and with-
out any indemnity, or means of enforcing any.   And the case
shows him to have been bankrupt during his official life.   The
town is left to rest entirely upon his pleasure, and his personal
responsibility.

Again, it is in effect declared in the bill of rights, as a part of
the constitution, that private property may be taken for public
uses only when necessity requires it, and not then, unless provi-
sion be made that the owner may receive an equivalent in money.
Now, if it be conceded that it is a matter of public use and neces-
sity, that the town of Randolph, or its inhabitants, should be
compelled to pay their money for the liquors purchased and to be
sold by the commissioner's appointee, there is no provision in this
law for making re-imbursement by the equivalent contemplated
by the constitution.

It is to be borne in mind, that this mode of compelling a town
to pay for the liquors thus purchased, does not stand upon the
ground and right of ordinary taxation.   For all public burdens,
other than corporate expenses of towns, villages, or school dis-
tricts, the law is uniform in its operation, acting upon the inhab-
itants of all the towns throughout the State, upon a uniform basis,
and by a uniform rule, and thus making the burden equal through-
out the State or county.

For all municipal purposes, whether in towns, cities, villages
or school districts, the matter of appropriation and taxation is
committed to the action and control of the inhabitants of the
respective corporations, acting in their organized capacity, under
the general laws of the State.   Under the law in question, so
far as the *public* benefit is concerned, having reference to the
entire State, the liability and burden imposed upon the respective
towns rest on no common principle, and are subject to no rule of
equality.   The liability and burden of each town are left to
depend on the acts of a person over whom the town has no con-
trol, either to direct or restrain.   So far as the public benefit,
having reference to the town itself, is concerned, the town is
deprived of any corporate action as to the purpose, amount or
manner of the expenditure, and may be compelled to respond to

any amount for which the agent may have pledged its credit.

A view of the case remains to be considered, which seems to us, upon the clearest principles, to be decisive against the validity of the law, as imposing a liability on the town to pay for the liquors bought by Mann.

The plaintiffs, by their suit, assert their right as arising *ex contractu*. It is claimed that through the agency of Mann, the town is party to a contract of purchase.

Now it is a fundamental element in all contracts, indeed, in any possible idea of a contract, that the party to be bound must have assented to the contract, either expressly or by implication. In this case there was no assent on the part of the town ; so that on common principles there was no contract, either express or implied.

If the town is to be bound as by contract, it must be by the compelling force of the law in question.

Can the town be thus compelled to become a party to, and to be bound by, such a contract?

State legislatures are restrained by the constitution of the United States, from enacting laws impairing the obligation of contracts. The legitimate force and application of the principle of this provision would prohibit the enactment of any law to compel a person to make, or become a party to a contract.

But passing this; it is prominent for notice, that the judges and courts that have gone farthest in sustaining laws of State legislatures against the restrictive provisions of constitutions, repudiate entirely the idea that a person, whether natural or artificial, can be compelled by legislative enactment, to become a party to, or to be subjected to liability upon, a contract, without his consent.

In *Sharpless* v. *The Mayor of Philadelphia*, 21 Penn. (in which case the doctrine of legislative omnipotence was, by a majority of the court, carried to the last verge of endurance) p. 165, Black, Ch. J., in delivering his opinion, as one of the majority making the decision, says, " I do not say, however, that a contract between two individuals, or between two corporations, can be made by the legislature. That would not be legislation. Besides, it would be impossible in the nature of things; for the essence of a contract is the agreement of the parties." And in

the following language, he marks the broad distinction between that case and this, even if his views of that case be regarded as sound.   He says, "but here is no contract made by the legislature, *but only an authority given to the respective corporations* to make one between themselves, if they see proper."

BRONSON, J., in *Taylor* v. *Porter et al.*, 4 Hill p. 143, says, "the powers of making bargains for individuals has not been delegated to any branch of the government."   In *Hampshire* v. *Franklin*, 16 Mass. p. 83, PARKER, Ch. J. says, "it certainly must be admitted that by the principles of every free government, and of our constitution in particular, it is not in the power of the legislature to create a debt from one person to another, or from one corporation to another, without the consent, express or implied, of the party to be charged.

In *Bowdoinham* v. *Richmond*, 2 Greenl. 42, and in *Brunswick* v. *Litchfield*, 2 Greenl. 28, MELLEN, Ch. J. holds the same doctrine.

This doctrine must receive, as it ever has received, the same application to a municipal corporation as to a private corporation, or to an individual, when it is sought to visit a pecuniary liability *ex contractu*, upon a town, by the ordinary means of a suit at law.

It is true, as was urged in the argument by the learned counsel for the plaintiffs, that in some respects, the legislature have a power in respect to municipal corporations, that they have not in respect to private corporations or individuals.   They may alter or abolish municipal corporations at pleasure, but, yet, not so as to defeat the pecuniary rights of individuals, as against such corporations, or as depending on their existence.   The legislature have the same power in respect to private corporations, when that power is reserved in the law creating them.   So far as a municipal corporation is endowed by law with the power of contracting, and as such, is made capable of acquiring, holding and disposing of property, and subject to the liabilities incident to the exercise of such power and capacity, thus being invested with legal rights as to property and contracts, and made subject to legal liabilities in respect thereto, to be ascertained and enforced by suit in the ordinary judicial forums, upon the same principles, and by the same means as in case of a private corporation, such municipal

corporation must stand on the same ground of exemption from legislative control and interference as a private corporation. As to third persons who seek to enforce pecuniary liabilities against towns, arising upon contract, such towns are merely private corporations or individuals, and in this respect, they are not affected by the purely municipal, public and political features that appertain to their corporate existence, in virtue of, and in reference to which alone, they are subject to the absolute control of legislation.

The respect, in which the legislature have unrestricted control over such corporations, is well marked in the case of *The People* v. *Morris*, 13 Wend. 325, in which NELSON, J. says, public corporations are created " by investing the people of a place with the local government thereof;" * * * " instituted for the purpose of exercising mere municipal jurisdiction, a power public and political, and which, by the constitution, belongs to the legislative department ;" * * * "political institutions, erected to be employed in the internal government of the State ;" * * * " the inhabitants, upon whom the powers and privileges are conferred, are mere trustees, who hold and exercise such powers for the public good;" * * * "the only interest involved is the public interest, and no other is concerned in their creation, continuance, alteration or renewal."

This view seems to be fully recognized and embodied in the learned and elaborate opinion drawn up by ISHAM, J., in the case of *Montpelier* v. *E. Montpelier*, 29 Vt. 12. That case, moreover, as well as that of *Bowdoinham* v. *Richmond*, demonstrates that some things are beyond the scope of legitimate legislation, as affecting municipal corporations, a doctrine entirely at variance with the idea of the illimitable supremacy of the law making power over such corporations.

The language of HUTCHINSON, J., in *Poultney* v. *Wells*, 1 Aik. 180, embodying the principle upon which the decision of that case was rested, is comprehensive, and to the point. He says, " the court are unanimous in the opinion that the school right, thus appropriated by the charter, belongs to the town of Wells, *so that the legislature can exercise no power over it to vary its appropriation, without the consent of the town*, and this consent must be by those who are inhabitants of the town at the time the assent is given."

See also, *Moodalay* v. *Morton*, 1 Br. Ch. 469; *Bailey et al.* v. *Mayor et al. of the City of New York*, 3 Hill. 531; *Fourth School District in Rumford* v. *Wood*, 13 Mass. 192; 2 Kent's Com. 275; Ang. & A. on Corp. § § 23, 24, 33; *Louisville* v. *The University*, 15 B. Munroe 642.

These cases, and many more that might be cited, fully indicate the double character which such corporations bear, and the rights which they have, and the relations which they sustain by virtue of each character respectively. They are expressions and illustrations of the reason why, from the fact of towns existing in organized corporations, *primarily* for certain public political purposes, as auxiliary to the practical government of the State, and as such, are under the absolute control of the legislature, it does not follow that they, as organized corporations, or the inhabitants composing them, can be subjected, arbitrarily, to pecuniary burdens and liabilities, to be responded to either by the property of the town or of its inhabitants.

In this case, the practical thing sought to be done under the the law in question, is, that the town, nominally as a corporation, but in fact, the inhabitants of the town subject to taxation, may be compelled to appropriate so much of their property, proportionately, as shall be sufficient to pay for the liquors purchased by Mann, in his character of agent, whatever may be that amount.

If through the artificial contrivance of municipal corporations, of which the inhabitants of the State must be members, *nolentes volentes*, such consequences can be wrought out, most persons would invoke the exercise of the annihilating power of the government over such corporations, rather than of the power of the *police regulation*, in virtue of which alone, this provision of the law is sought to be sustained.

We have less occasion for delicacy, arising from a feeling of deference towards a co-ordinate department of the government, in coming to the result we do in this case, for the reason that the legislature have anticipated us, by the amendment of 1853, in virtually declaring that the provision in the original act, for pledging the credit of the town, and binding it by the contract of the agent, without its consent and without indemnity, was unwarranted legislation.

The judgment is reversed, and the case remanded to the county court.

The case of *Dexter & Torrey* v. *The Town of Braintree*, is disposed of by this decision. It being book account, the judgment is reversed, and judgment rendered by this court for the defendant.

BENNETT, J., dissenting. From the best examination which I have been enabled to give to the subject matter now before the court, I have not been able to bring my mind to the same result to which my brethren have come, and I feel called upon to state the grounds of my opinion as briefly as the importance of the case will admit. The whole question in issue, is, I apprehend, involved in this single inquiry, has Mann, by reason of his appointment as the agent of the town of Randolph, by the county commissioner, under the act of 1852, passed " to prevent the traffic in intoxicating liquors," a valid authority to bind the town? If he had not, it is clear, judgment should be for the defendants. Before proceeding to consider the main question in the case, it is important to dispose of some preliminary ones.

It is too late to question that the statute of 1852 is a matter of *police regulation*, and the courts of this State have already held the main provisions of that law to be constitutional, and it need hardly be said, that if the main provisions and the whole scope of a law are of a *police character*, the minor provisions, which were designed to carry out the main provisions of the law, and to remove all temptation or occasion for violating the *prohibitory part* of the law, are equally of a *police character* with its main provisions.

It was the right and the duty of the legislature, not only to provide proper penalties for the violation of its prohibitory provisions, but to throw around the law such guards as were calculated to prevent its abuse; and hence the legislature sought to regulate the traffic in cases where it was allowed by the statute to keep and sell intoxicating liquors; and if they have exercised that right in a constitutional manner, no one can complain of a want of power, even though he may differ from the legislature as to the expediency of the provision. It can not be claimed, and

Atkins & Co. *v.* The Town of Randolph.

I do not put the case upon any such ground, that the town of Randolph and Mann stand in the relation of principal and agent, as that relation exists at common law; but he is to be viewed in the light of a *government agent*, appointed by the county commissioner, whose election is given to the freeman of the county, and under whose immediate control the town agent is placed, and subject to removal by the commissioner. Both the *county commissioner* and the *town agent* act *officially*, and by virtue of their appointment, under the act of 1852, and it is only in this sense that Mann can be called an agent for Randolph, and in this view we are to consider the question, whether it was within the pale of the constitutional powers of the legislature to invest Mann with authority to bind the town to pay for liquors bought by him for the legitimate purpose of carrying out his agency. The fact must not in this case be lost sight of, that the legislature have not undertaken to compel towns to go into a traffic in ardent spirits, or become accessory thereto *for the purpose of private gain and advantage, and there is no blending of the public purpose, which the government had in view, with a private one.* By the statute, the liability of the town is only made *co-extensive* with the *public* purpose and necessity. The *government agent* is only supposed to purchase liquors upon the credit of the town for *the special purposes designated* in the public act of the legislature, the traffic in which they have deemed it wise to put under the control of their immediate agents.

It is not to be presumed that the agent may or will abuse his trust, and we can not, from an abuse of the trust, infer a want of power in him to do the things which the statute fairly contemplates he should do. Though the towns are to have the avails of the sales, after paying the agents, and this is but a matter of justice, still, the idea that this was a business gone into for the *private profit* of the towns, has not entered the head of any one. The liability upon the towns was imposed by the legislature purely for a *public purpose*, and to carry into execution *a police regulation*, but the question still returns, had the legislature the *constitutional* power to carry out *this police regulation* in the manner in which they have attempted to do it?

The federal government has only such powers as are delegated

17

to it expressly by the United States constitution, or such as are impliedly given, as being necessary to carry out those which are expressly given. The State constitution contains a general grant of all powers, not excepted, and in our bill of rights it is declared " that the people of this State, by their legal representatives, have the sole, inherent and exclusive right of governing and regulating the internal police of the same." It may be, and is, I think, true that the State government would possess such power independent of this provision in the bill of rights, and that its design was to express a positive denial that the general government should possess any such power, but this does not seem material to the question in issue. That the *internal police* of the State is a matter for the State legislature exclusively to manage, is a point conceded by all, and I am not aware of any provision in the State constitution which is impugned by the third section of the act of 1852. The question before us is not a question of policy, but of *constitutional power*, and no court should presume to declare an act of a co-ordinate branch of the government *void*, except where the act is a *clear and a palpable* violation of the constitution, in fact, *so clear and palpable* as to leave no doubt or hesitation on the minds of the court.

This is the rule as expressed by Chief Justice MARSHALL, in the case of *Fletcher* v. *Peck*, 6 Cranch 128, and the same thing has been said in substance by courts, as often as a question of constitutional law has come before them. If neither the United States constitution, nor that of this State, contain a *denial* of the power in the legislature to enact the provision in question, I hardly think it will be claimed by any constitutional lawyer that the provision in the act under consideration is void, as being against the principles of *natural justice,* Objections to a law, resting upon principles outside of those instruments, should be addressed to the legislature, or to the people, and not to courts. Courts can not correct *an abuse of power* in the legislature, so long as they keep within the general scope of the powers given them by the constitution of the United States, and not denied them by the State constitution. Under the constitution of the United States, nothing can be done but what is authorized expressly, or by clear implication by that instrument; but the legislature, under

the State constitution, may do whatever is not prohibited. The powers, not given to the government of the Union, are conferred upon the government of the State, with those limitations and exceptions expressly contained in the State constitution.

Inasmuch as it must be conceded that the statute of 1852 is a matter of police regulation, and within the province of the legislature, it must be admitted they had the right to provide a mode by which liquors might be kept and sold for certain lawful purposes, with the design of thereby removing both the temptation, and any fancied necessity of violating the prohibitory parts of the law, and may do it in such a way as they shall think proper, if they keep within the pale of their constitutional powers.

We do not claim that the legislature can pass a law taking the property of one man and giving it to another, whether with or without compensation. Such a proceeding would not have the character of a law. It would be nothing more nor less than a *sentence* or *edict*, but that, as it appears to me, is not this case. This act does not attempt to divest the towns of any property, but simply confers upon the town agent the power to purchase liquors upon the responsibility of the town, not for the purposes of an *ordinary traffic*, but to carry out a *police regulation;* and though it may be true " that the power of making bargains for individuals has not been delegated to any branch of the government," as was said by Bronson, J. in 4 Hill 143, yet, as I conceive, the towns are not bound by force of any contract, but a duty is imposed upon the towns, *as municipal corporations*, to pay for the liquors, and this for *political purposes* and to carry out a *police* regulation.

Upon the creation of towns for political purposes, the State does not part with any legislative power over the inhabitants of the town or their property, and the inhabitants, as corporators, can claim no exemption from the general legislation for police purposes. The reasons are obvious. They are not made corporators by the organization of the town, so as to have any interest in the property of the territory which they had not before, and no such exemption is made in the charters; and certain it is, that none should be implied which would be calculated to weaken the

legislative power of the State ; and it may be added, that if such an interest existed, it would be an individual right which a majority could not vote away.

It is the duty of the State to make police regulations, guarding the property, health and morals of its inhabitants, and none can question their right to regulate the sale of medicine, food, powder, intoxicating liquors and the like, so as to prevent an indiscriminate sale and use of the same. If the State can not appoint agents to bind the towns, without their assent, because of a vested right in the inhabitants of the towns, which should exempt them from such legislation, it would follow that the legislature could not authorize a *majority* to bind a *minority* without their consent. If this provision in the law of 1852 is *void*, for want of constitutional power, the State could not direct that the towns should appoint agents to bind themselves without their consent. What the State can not do *directly*, they have no power to do *indirectly*. If the State has no power to impose a legal obligation or duty upon another, they can have no power to require such person to take upon himself such legal obligation or duty without his assent. The manner in which the agent is appointed is not the point upon which the question turns. The point is, I apprehend, the liability of the towns to be taxed against their will. In illustration of the principles which should govern this case, we may instance the case of highways. As a police regulation, the towns are required to build and maintain roads and bridges, and the State appoint a board whose duty it becomes to lay out and establish roads, and the towns are legally charged with the expense of paying land damages, and building and maintaining the roads, though all is done against the consent and will of the towns, and none can question that the right exists in the towns to tax the inhabitants to meet the expenditures.

Suppose the legislature should pass a law making it the duty of each town in the State to build poor houses, of such a plan and at such an expense, as an agent of the government should deem suitable, and clothing him with powers to build the same at the expense of the towns, could it be claimed that the legislature had transcended their constitutional powers, and that the right of taxation did not exist in the towns?

There does not appear to be anything particularly unjust in the provisions of this law, as they strike me.

The town agents are made by the law trustees for the town, and hold the avails of the sales of the liquor sold, for the benefit of the town. But is is said, all this is *without the consent of the town.* Be it so, and though this might be a sound objection if it was the object of this law to authorize an ordinary traffic in ardent spirits, as a means of business, yet, this objection has no force in my mind, when we consider this duty is imposed upon the towns as part of a police regulation.

It may be, that the statute of 1852 does not sufficiently guard the towns against *abuse*, but we are not to presume *an abuse* by the town agents, and from that, argue a want of *constitutional power* to pass the law.

I do not see how this law can be considered obnoxious to that provision in the constitution which makes private property subservient to public uses, only on condition that the owner shall receive *an equivalent in money.* No property in this case is taken, nothing which can be estimated, and it has been well settled that consequential damages arising to a man's real estate, from the construction of a railway across the lands of another, does not entitle the party to damages under this provision of the constitution, for the reason that nothing is taken for public use, within the provision of the constitution. I see no absolute necessity that the towns should have a right to appoint the agent, or should have a right to control him in order to render the act valid. He is to be treated as a government agent, and though, as matter of prudence, the legislature might well have limited the amount for which the agent could bind the town, and also require of him a a bond, with sureties, for the faithful performance of his duty, as was done in the subsequent year, yet this does not go to show a want of power, it only affects the manner of its exercise.

The third section of the statute provides, that the town agent may purchase the liquors " at the expense of the town." The liability imposed upon the town is a *statute liability*, not resting in contract, expressed or implied, and the *privity* between the vendors of the liquors and the towns, is *a statute privity*, and in

no way dependant upon the ordinary principles of the common law relative to contracts. I do not claim that the legislature has power to make a contract between two persons, whether natural or artificial. An act attempting it, would not possess any of the attributes of a law, and besides, as the essence of every contract is the assent of the parties, it would not be practicable in the nature of things. But I do claim that a person, and especially a municipal corporation, may be bound without their consent, to perform their share of what may justly be deemed a *public* obligation or duty. Those duties and obligations which affect a person, not as an individual, but only as a member of the community in which he resides, and in the same way that his fellow citizens are affected, must necessarily be *prescribed* by the supreme power of the State. The legislature deemed it wise to keep the control of the traffic in intoxicating liquors, to be used for medicinal, chemical and mechanical purposes, in the hands of government agents, the design of which was, to prevent a violation of the prohibitory parts of the law.

To carry out this *public* provision in the law, it became necessary that the *government agents* should be possessed of the liquors, and in my view, that provision in the law, which empowers the town agent to purchase the liquors at the expense of the town, does impose a *public duty* upon the town in no way depending upon contract for its vitality.

It is objected to this law, that the town, nominally as a corporation, but in fact the inhabitants of the town liable to taxation, may be subjected to pay for the liquors bought by the agent proportionally to their grand lists.

Suppose it be admitted in a particular case, that the sum paid into the town treasury from the sales of the liquor be insufficient to pay the first cost of it, and it becomes necessary that the town vote a tax to make up the deficiency, the answer is, if this duty is imposed upon the town in pursuance of a law passed by the legislature of the State, and within the pale of their constitutional powers, *it must be borne.* The taxing power is in the legislature, and it is said by Chief Justice MARSHALL, in the case of *McCullough* v. *State of Maryland*, 4 U. S. Cond. 486, "this power

may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it."

We do not claim that the power of taxation can be exercised for a *private purpose*, nor do we claim that the whole of a public burden can be thrown upon a single corporation or individual, under the pretence of taxing him, nor can one county or town be taxed to pay the debt of another. If this was attempted, the act of the legislature would not be a law, but would be no more than an edict or a judicial sentence. It is no doubt the theory of republican governments that there shall be an equality in taxation, but it has been well said "that a just and perfect system of taxation is yet a desideratum in civil government." The rule as laid down by the supreme court of Kentucky, 9 B. Monroe 345, is "that a tax law must be considered valid, unless it be for a purpose in which the community taxed has palpably no interest, where it is apparent that a burden is imposed for the benefit of others, and where it would be so pronounced at the first blush." This rule we think judiciously laid down. We admit that the legislature could not authorize a municipal corporation to lay a tax in order to raise funds for a mere *private* purpose. This would not be taxation, which implies the raising of money for *public* purposes.

The right to tax depends upon the ultimate use and object for which the fund is raised, and not upon the channel through which it is to be applied. A tax for a *private purpose* is not authorized, though the funds pass through the hands of a *public officer*, and if the tax be for a *public purpose*, it is none the less valid because it may be under the direction of an individual. If the legislature were to pass a law appointing an agent to erect a pest house in each town in the State, and clothing him with authority to erect the same at the expense of each town, I apprehend no one would contend this was not a valid law, yet the purpose would be no more *public*, than the purpose under the law in question, which is to carry out a *police regulation*. If the legislature could create a debt against the State for the liquors that might be purchased by the several town agents, and lay taxes on the whole people to pay for them, may they not create a debt against each town for the

liquors purchased by its own agent, and allow the town to tax themselves to promote the execution of a police regulation in their own town, in which all have a common interest. It is true, no doubt, that the inhabitants of a town can not by vote impose a tax for an object entirely foreign to their political or municipal duties, but I do not deem this such a case. This is not to embark the town in a *private* business, or to make the people pay for something in which they have no interest. Towns are municipal corporations, creatures of the legislature, and I do not see how the constitutional powers of the legislature over them are to be limited, unless there is an attempt to compel them against their will to go into a *private* business, or make them pay for a thing in which they have no interest.

It is, I apprehend, no objection to the *validity* of this law that the towns have no control over the government agents in regard to the discharge of their duties ; indeed, the whole policy of the law of 1852 is to put it in other hands.

It might have been wise to require the agents to give security for the due and faithful discharge of their duties, and to limit the amount for which they could pledge the credit of the town ; but a want of this does not affect the question of constitutional power. We can not argue a want of constitutional power *from the abuse of a law*.

The legislature seeing no doubt that the third section of the act of 1852 might be exposed to abuse, in their act of 1853 guarded against it by limiting the powers of the town agents to bind the towns in any case to the sum of five hundred dollars, and not for any amount, even under that sum, unless by the direction or permission of the selectmen of the town, *or unless the agent should deposit with the selectmen of the town a good and sufficient bond in the sum of five hundred dollars, conditioned for the faithful execution of his agency.* See statutes of 1853, p. 20. This act of 1853 does not go upon the ground that the legislature treated the third section of the act of 1852, as unconstitutional, but simply to guard it against abuse. If the agent deposited the bond, he could bind the town, *nolens volens*, to the amount of five hundred dollars.

This involves the same constitutional principle as is involved in the act of 1852.

It can hardly be made out that the third section of the act of 1852 is within the prohibition of the constitution of the United States, which forbids the passage of a law impairing the obligation of contracts.

The law in no way acts upon a contract already made, but it attempts simply to impose *a duty* upon the towns for a *public* purpose, and this I think is within the constitutional power of the legislature if they see fit to use it. It may safely be assumed that the constitution of this State allows to the legislature every power which it does not in terms, or by necessary implication, prohibit, or which have not been delegated to the federal government. To oust the jurisdiction of the legislature, the prohibition must be express, or a necessary implication. As I can find nothing in the constitution of this State, or of the federal government, to forbid the provision in question, I think it should be held valid, and that the legislature should not be charged with having transcended their constitutional powers.